**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMSURG EC WASHINGTON, INC., Plaintiff, v. MGG GROUP COMPANY, INC., et al., Defendant. | ) | Civil Action No. 23-2416 (RBW) |

# MEMORANDUM OPINION

The plaintiff, AmSurg EC Washington, Inc. ("AmSurg"), brings this civil action against the defendants, MGG Group Company, Inc. ("MGG"), District Endoscopy Center, LLC ("District Endoscopy"), Michael L. Weinstein, M.D. ("Dr. Weinstein"), Dominique Howard, M.D. ("Dr. Howard"), and Ramsey Daher, M.D. ("Dr. Daher"), alleging breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, wrongful withdrawal, civil conspiracy, aiding and abetting breach of fiduciary duty, and tortious interference with contract/inducement of breach of contract. See Complaint ("Compl.") at 1, 30, ECF No. 1. Currently pending before the Court is the defendants' motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. See Defendants' Motion to Dismiss ("Defs.' Mot.), ECF No. 9. Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must deny the defendants' motion to the extent it seeks dismissal

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiff's Response in Opposition to Defendants' Motion to Dismiss the Complaint ("Pl.'s Opp'n"), ECF No. 11; and (2) the Defendants' Reply to Opposition to Motion to Dismiss ("Defs.' Reply"), ECF No. 12.

for lack of subject-matter jurisdiction and deny in part and grant in part the defendants' motion to the extent it seeks dismissal for failure to state a claim for which relief can be granted.

## I. BACKGROUND

### A. Partnership Agreement

The plaintiff, AmSurg, is a Tennessee corporation engaged in the business of "developing and managing ambulatory surgery centers in partnership with physicians." Compl. ¶ 1–2. Defendant MGG is a Maryland corporation registered to do business in the District of Columbia that is "owned by several physicians who specialize in gastroenterology." Id. ¶ 2. These physicians include defendants Drs. Howard and Weinstein. Id. ¶¶ 11–12. In 1993, the plaintiff and MGG entered into an Agreement of Limited Partnership (the "Partnership Agreement") to form the Endoscopy Center of Washington ("ECW"), a Tennessee limited partnership. Partnership Agreement ("Partnership Agreement"), Compl., Ex. A, ECF No. 1-1. The Partnership Agreement provides that "[t]he business to be conducted by the Partnership shall be to own and operate [an ambulatory surgery center in Washington, D.C.] and to carry on any and all activities necessary, proper, convenient, or advisable in connection therewith." Id. § 4. The Partnership Agreement was signed on May 28, 1993, and was amended twice on July 1, 2002. Partnership Agreement at 18 ("First Amendment") and 23 ("Second Amendment").

The Partnership Agreement designates the plaintiff as the general partner and MGG as the sole limited partner in the partnership. Id. at 17. The Agreement also creates an Advisory Board "consisting of four (4) persons, two (2) of whom shall be appointed by the General Partner and two (2) of whom are appointed by the Limited Partner." Id. § 10. Prior to taking any of the enumerated eighteen actions listed in the Partnership Agreement, the General Partner must first receive the Advisory Board's approval, which is obtained by a majority vote of three out of four

members. Id. Most relevant here, the Advisory Board's approval was required prior to ECW's acquisition of "any land or real property interest including any lease[.]" Id.

Additionally, the Partnership Agreement states that the partnership shall last until December 31, 2043, unless certain conditions are met permitting early termination. Id. § 5. It also contains a choice-of-law provision requiring that "[t]he laws of the State of Tennessee shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties hereto." Id. § 20.5; see also id. at First Amendment § 11, Second Amendment § 7 (applying similar choice-of-law provisions to the amendments to the Partnership Agreement). Notably, the Partnership Agreement subjects MGG and its shareholders to a non-compete provision in § 9.3, which forbids them from "competing with the [ECW] Partnership within the District of Columbia, or Chevy Chase or Bethesda, Maryland, until the later of (i) five years from the date of this Agreement, or (ii) one year after the Limited Partner ceases to be a Partner."[2] Id. § 9.3.

The General Partner was responsible for managing and controlling the ECW Partnership. Id. § 11.3. Conversely, MGG, as the Limited Partner, "[e]xcept as otherwise provided in [the] Agreement[,] . . . [has] no right or authority to act for or bind the Partnership." Id. § 9.4. The plaintiff alleges that Dr. Weinstein and Dr. Howard were part-owners, directors, and lead decision-makers for MGG, and that both were "members of [the ECW Partnership's] Advisory Board from at least 2016 to the [date of the filing of the Complaint]." Compl. ¶¶ 11–12.

[2] The General Partner, the plaintiff, is held to a different non-compete restriction, id., not alleged to have been breached by any of the parties.

## B. The ECW Partnership and Emergence of the Dispute

The ECW partnership began operating its ambulatory surgery center in leased offices located at 2021 K Street, Washington, D.C. in 1993. Compl. ¶ 43. The plaintiff alleges that the clinic's "lease was set to expire on February 28, 2023[,]" and that "by early 2022, MGG Group . . . determined that the time had come to find an alternative [location for the center.]" Id. The plaintiff further alleges that MGG, "at their request, and given their familiarity with the local real estate market" in Washington, D.C., "took [the] lead in [the] search process on behalf of ECW." Compl. ¶ 44. MGG "identified a suitable new location for [the] ECW [Partnership] and its [new ambulatory surgery center] at 2000 Pennsylvania Avenue, Washington, D.C.[,]" and in March 2022, with AmSurg's consent, "entered into lease negotiations on behalf of [the] ECW Partnership." Compl. ¶ 45.

However, relations between the partners deteriorated. See generally Compl. The plaintiff alleges that the defendants "were scheming to exploit the expiration of the existing lease" and their position as lead negotiators for the new lease to either force a change in the partnership's revenue split or to independently secure the lease to "develop a competing surgery center without AmSurg." Compl. ¶ 48. According to the plaintiff, the defendants elected to open a competing surgery center and registered District Endoscopy, one of the defendants and a subsidiary of MGG, as a new entity in Washington D.C. on August 5, 2022, to operate the planned competing center. Compl. ¶ 50. Eight weeks after the alleged registration of District Endoscopy as a new entity, on September 30, 2022, defendant MGG's counsel informed the plaintiff's counsel that "[t]he status quo has not been fair and is no longer tenable for MGG, and therefore several issues, as well as contractual provisions, justif[ied] the wind down [of] the business relationship." Compl., Ex. B at 2, ECF No. 1-2. Defendant MGG's counsel again on

October 10, 2022, informed the plaintiff's counsel that "one or more of those affiliated with [MGG] have been planning to establish a new center in the District of Columbia." Compl., Ex. D. at 2, ECF No. 1-4.

The plaintiff, reacting to the defendants' stated intent to operate a separate business after the 2021 K Street lease expired, obtained a short-term lease extension for the current location beyond the original February 2023 expiration date, although the plaintiff alleges that "the [physicians] ha[d] not scheduled any procedures at the 2021 K Street center after May 1, 2023," Compl. ¶ 68, after which the physicians associated with MGG, through District Endoscopy, were supposedly "planning to schedule . . . procedures at the new competing surgery center," Compl. ¶ 68. On May 15, 2023, the plaintiff declared Chapter 11 Bankruptcy. Memorandum in Support of Defendants' Motion to Dismiss ("Defs.' Mem.") at 2; see also Voluntary Petition for Non-Individuals Filing for Bankruptcy Form 201 at 5, ECF No. 9-2. The plaintiff alleges that the defendants shortly thereafter took "steps to develop the new competing surgery center" at 2000 Pennsylvania Avenue. Compl. ¶ 69.

These efforts allegedly included publishing a notice on June 12, 2023, in The Washington Post that District Endoscopy "would be applying for a certificate of need for [the] new surgery center[,]" Compl. ¶ 69, filing "a letter of intent with the Washington, D.C., State Health Planning and Development Agency to apply for a certificate of need to establish the new competing center[,]" Compl. ¶ 70, and engaging "an architecture, interior designer, and engineering firm for the new center[,]" Compl. ¶ 72. Finally, the plaintiff alleges that in August of 2023, the new center at 2000 Pennsylvania Avenue was scheduled to "commence operations in or about September 2023[,]" Compl. ¶ 73, and that another ambulatory surgery center developed by "one or more of MGG Group['s] affiliates" was going to "commence operations imminently" in

Chevy Chase, Maryland, in violation of the Partnership Agreement's noncompete provisions, Compl. ¶ 74.

## C. Procedural Background

The plaintiff initially brought suit in the Tennessee Chancery Court on February 10, 2023. Compl. ¶ 66. On July 14, 2023, the Chancery Court ruled that "it does not have personal jurisdiction over any of the [d]efendants in this dispute[,]" and dismissed the case. Final Order and Memorandum at 19–21, ECF No. 9-1. The plaintiff subsequently filed its Complaint in this Court on August 18, 2023. The plaintiff's Complaint asserts eight claims against the various defendants. The plaintiff seeks compensatory damages "believed to be not less than $5,000,000.00[,]" Compl. ¶ 8, as well as "punitive or statutory damages," Compl. ¶ 9, and an injunction against "violating and/or tortiously interfering with the Partnership Agreement[.]" Compl. ¶ 10.

The defendants subsequently filed their motion to dismiss on September 22, 2023, seeking to dismiss "all claims" pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure arguing, that the plaintiff does not have standing to bring their claims, and alternatively arguing under Rule 12(b)(6), that the plaintiff has failed to state a claim for all eight of their claims. Defs.' Mem. at 1. The plaintiff then filed its response in opposition to the defendants' motion to dismiss on October 16, 2023, see generally Pl.'s Opp'n, and the defendants submitted their reply brief on October 23, 2023, see generally Defs.' Reply.[3]

---

[3] Additionally, on April 8, 2024, the plaintiff filed a motion for preliminary injunction, seeking to have the Court prohibit the defendants "from directly or indirectly owning or engaging in any further efforts to develop, build, license, or operate any ambulatory surgery center ("ASC") within the District of Columbia or Chevy Chase or Bethesda, Maryland, and from any other action that is contrary to their contractual obligations to AmSurg." Plaintiff's Motion for Preliminary Injunction at 1, ECF No. 16. The Court denied the motion, holding that the plaintiff failed to meet its burden to demonstrate irreparable harm because "the plaintiff has provided no reason for this Court to depart from the established rule that 'economic harm does not constitute irreparable injury.'" Order (Apr. 26, 2024) at 6, ECF No. 30 (citing to Sterling Com. Credit Mich., LLC v. Phoenix Indus. I, LLC, 762 F. Supp.

(continued . . .)

## II. STANDARDS OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(1)

"Federal district courts are courts of limited jurisdiction[,]" Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and therefore, "[a] motion for dismissal under [Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's jurisdiction[,]'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)). Thus, the Court is obligated to dismiss a claim if it "lack[s] ... subject matter jurisdiction[.]" Fed. R. Civ. P. 12(b)(1). And, because "it is to be presumed that a cause lies outside [the Court's] limited jurisdiction," Kokkonen, 511 U.S. at 377, the plaintiff bears the burden of establishing by a preponderance of the evidence that a district court has subject matter jurisdiction, see Nurse v. Sec'y of Air Force, 231 F. Supp. 2d 323, 326 (D.D.C. 2002) (Walton, J.) (citations omitted).

In deciding a motion to dismiss based on lack of subject matter jurisdiction, the Court "need not limit itself to the allegations of the complaint." Grand Lodge of the Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001). Rather, the "[C]ourt may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005). Additionally, the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the

---

(. . . continued)
2d 8, 16 (D.D.C. 2011) (quoting Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291, 1295 (D.C. Cir. 2009)). The Court did not reach the merits of any of the plaintiff's claims in its Order denying the plaintiff's preliminary injunction motion. See generally id.

benefit of all inferences that can be derived from the facts alleged[.]'" Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)). However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (alterations in original) (citation and internal quotation marks omitted). And, the Court "need not accept bare legal conclusions nor unsupported inferences." Campaign Legal Ctr. v. Fed. Election Comm'n, No. 22-cv-3319 (CRC), 2024 WL 4263853, at *5 (D.D.C. Sept. 23, 2024) (citing Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002)).

**B. Federal Rule of Civil Procedure 12(b)(6)**

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff plead[s] factual content that allows the court to draw [a] reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth."

Iqbal, 556 U.S. at 679. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint[.]" Hettinga, 677 F.3d at 476. Finally, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## III. ANALYSIS

The defendants first move for dismissal under Rule 12(b)(1) for a lack of subject-matter jurisdiction, under the theory that the plaintiff's bankruptcy petition resulted in the automatic dissolution of the ECW Partnership and thus the Court is deprived of jurisdiction to review the plaintiff's claims. See Defs.' Mot. at 22. The defendants alternatively move for dismissal under Rule 12(b)(6) of all eight claims asserted by the plaintiff for failure to state a claim. The Court will first address the defendants' Rule 12(b)(1) argument, then provide an overview of its conflict of law analysis as it pertains to each of the eight counts, and will conclude its analysis by addressing the Rule 12(b)(6) motions as to each of these counts.

### A. The Defendants' Rule 12(b)(1) Challenge

The defendants first move for dismissal under Rule 12(b)(1), alleging that because the plaintiff filed a petition for relief under Chapter 11 of the Bankruptcy Code, "that voluntary action caused AmSurg to become 'dissociated' from ECW." Defs.' Mem. at 12 (citing to Tenn. Code Ann. § 61-1-601(6)(A)). Thus, according to the defendants, since the general partner of ECW, which had the exclusive authority to operate the Partnership, vacated the business, "the

[P]artnership [was] effectively terminated prior to any alleged injury, which deprives AmSurg of standing to bring this action," id., due to the fact that "Am[S]urg simply has not suffered any injury that could be redressed by a decision of this Court[,]" id. at 14. And, as stated by the defendant, "[s]tanding is an essential component of the case-or-controversy requirement in federal court[,]" id. at 12 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). As support for its position, the defendants claim that the Tennessee Revised Uniform Partnership Act ("RUPA") provides that "[a] partner is dissociated from a partnership upon the occurrence of . . . [t]he partner's [b]ecoming a debtor in bankruptcy . . . ." Id. at 13 (citing Tenn. Code Ann. § 61-1-601(6)(A)). Thus, according to the defendants, "AmSurg's dissociation—and the resulting end of ECW's business—deprives AmSurg of any redressable injury in fact [, and therefore[,] AmSurg's only cognizable injury in this case is prospective . . . [, which is not an] injury that could be redressed by a decision of this Court." Id. at 13–14.

In response, the plaintiff contends that the RUPA is not the applicable law that governs the Partnership Agreement, but instead the Partnership Agreement was formed under the Tennessee Revised Uniform Limited Partnership Act ("RULPA"), Tenn. Code Ann. §§ 61-2-101, et seq. Pl.'s Opp'n at 12–13 ("Limited partnerships formed before 2018 are governed by the Tennessee Revised Uniform Limited Partnership Act ("RULPA"), Tenn. Code Ann. §§ 61-2-101, et seq."). And, under the RULPA, the plaintiff argues that "'[u]nless otherwise provided in the partnership agreement,' '[a] person ceases to be a general partner of the limited partnership' if it files a voluntary bankruptcy petition, is adjudged bankrupt or insolvent, or files a petition or answer seeking reorganization or similar relief." Id. at 13 (citing Tenn. Code Ann. § 61-2-402(a)(4)(B)-(D)). Here, the Partnership Agreement states that "'[f]iling a petition seeking for the General Partner any reorganization' 'shall not constitute a withdrawal of the General

Partner[,]'" id. (citing Partnership Agreement § 13.5.2), and "[i]f an order for relief is entered in behalf of or against the General Partner under Chapter 11 of Title 11, United States Code, the General Partner shall continue to serve as the General Partner of the Partnership and such order for relief shall not be deemed an event of withdrawal of the General Partner[,]" id. (citing Partnership Agreement § 13.3).

As noted above, Tennessee law allows for partnerships to be formed under multiple different acts, most relevant here the RUPA and the RULPA. Partnerships formed under the RULPA may not be construed as partnerships under the RUPA, see Tenn. Code Ann. § 61-1-102(b) ("An association formed under a statute other than this chapter, a predecessor statute, or a comparable statute of another jurisdiction is not a partnership under this chapter."), although elements of the RUPA may still govern the RULPA where the RULPA is silent on an issue, see Tenn. Code Ann. § 61-2-1205 ("In any case not provided for in this chapter [of the RULPA], the Tennessee Uniform Partnership Law [the RUPA], compiled in chapter 1 of this title, and the rules of law and equity shall govern."). Here, the Partnership Agreement clearly established the Partnership under the RULPA, not the RUPA. See Partnership Agreement § 2.1 ("The parties hereby form a Limited Partnership under and pursuant to the Act[,]"); Partnership Agreement § 1.1 ("'Act' means the Revised Uniform Limited Partnership Act [the RULPA], as adopted in the State of Tennessee . . . ."). When faced with an unambiguous contract, interpretation of the contract is a question of law that is appropriately resolved by a motion to dismiss. See, e.g., 731 Real Est. Grp., LLC v. Fuzzell, No. W2024-01053-COA-R3-CV, 2025 WL 2977085, at *7 (Tenn. Ct. App. Oct. 22, 2025); Weng v. Walsh, 30 F.4th 1132, 1136 (D.C. Cir. 2022). And, the Court finds that the Partnership Agreement is clearly formed under the RULPA as a matter of law.

Partnerships established under the RULPA, rather than the RUPA, enable the parties to contract around the default rule under Tennessee law that a bankruptcy petition results in an automatic withdrawal from a partnership. See Tenn. Code Ann. § 61-2-402(a) ("[A] person ceases to be a general partner of a limited partnership . . . [u]nless otherwise provided in the partnership agreement."). And, this is precisely what the parties agreed to when they entered into the Partnership Agreement. See Partnership Agreement § 13.5 ("Filing a petition seeking for the General Partner any reorganization . . . shall not constitute a withdrawal of a General Partner.").

In response, the defendants in their reply brief, argue that while the Partnership Agreement prevents the plaintiff's bankruptcy from constituting a "withdrawal" from the partnership, the plaintiff's bankruptcy resulted in the plaintiff "ceasing to be a general partner[,]" Defs.' Reply at 4, thus causing the plaintiff to be "disassociate[d]" from the partnership. The defendants ask this Court to find that a general partner's "withdrawal is different from ceasing to be a general partner—[as] a party can lose its status as general partner but still remain in the partnership." Id. However, the Court does not find this distinction meaningful, and the defendants have failed to present any authority under Tennessee law that supports their position.

Regarding the phrase "ceasing to be a general partner[,]" while the defendants note that "[t]he term 'withdrawal' is not defined in either [the RUPA or the RULPA,]" the RULPA defines "[e]vent of withdrawal of a general partner"[4] as equivalent to "an event that causes a person to cease to be a general partner as provided in § 61-2-402." Tenn. Code Ann. § 61-2-

[4] Indeed, § 13.5 of the Partnership Agreement uses language nearly identical to the phrase "[e]vent of withdrawal of a general partner." Compare Partnership Agreement § 13.5 ("Occurrences Which Are Not Events of Withdrawal by a General Partner") (emphasis added) with Tenn. Code Ann. § 61-2-101(5).

101(5). The statute that this definition references—which the defendants argue triggers the automatic withdrawal—also treats these terms equivalently as § 61-2-402 is titled "[w]ithdrawal or removal of general partner[,]" and is entirely focused on defining which events cause "[a] person [to] cease[] to be a general partner of a limited partnership." Tenn. Code. Ann. § 61-2-402(a).

The defendants argue that withdrawal necessarily entails ceasing to be a general partner, but a party may cease to be a general partner without withdrawing from the partnership. By doing the latter, the general partner could remain in the partnership and "still retain[] the right to share in the partnership's profits." Defs.' Reply at 3. But the defendants identify no provision in Tennessee statute that provides a pathway for the general partner to do so, nor do they cite any authority indicating how this process of a general partner ceasing to be a general partner without withdrawing from the partnership would occur. Instead, the statute speaks only to withdrawal and is silent on whether and how a general partner could lose its position as a general partner and be transformed into a different kind of partner. Thus, the Court finds that withdrawal and "ceasing to be a general partner" under the RULPA are one and the same.

The defendants argue alternatively that the provision in the RUPA listing events that cause the "dissociation" of a partner from a partnership applies to the ECW Partnership under § 61-2-1205 ("In any case not provided for in this chapter [of the RULPA], the Tennessee Uniform Partnership Law [the RUPA], compiled in chapter 1 of this title, and the rules of law and equity shall govern."). Tenn. Code Ann. § 61-2-1205. "Dissociation" is a term that appears in the RUPA, but not in the RULPA. The term is not defined in the RUPA; however, its meaning is clarified by the Editors' Notes to the statue which state that "'dissociation,' is used . . . to denote the change in the relationship caused by a partner's ceasing to be associated in the

carrying on of the business." Tenn. Code Ann. § 61-1-601 (Editors' Notes / Uniform Law Comment Number 1). The RULPA also addresses this situation for general partners, which it terms as a "withdrawal." The Court therefore has no reason to suspect that "dissociation" in the RUPA is intended to govern the RULPA via § 61-2-1205, as the RULPA already defines how a general partner "ceas[es] to be associated in the carrying on of the business[,]" which a party does so by withdrawing from the partnership.

In summary, the Partnership Agreement here states, in relevant part, that the general partner's filing for Chapter 11 bankruptcy is "Not [an] Event[] of Withdrawal by a General Partner[,]" Partnership Agreement § 13.5; see also § 13.5.2, and accordingly § 61-2-402(a)(4)(B) has no applicability here, since the parties properly contracted to avoid its requirements.[5] Therefore, the plaintiff's bankruptcy filing has neither resulted in withdrawal from, nor caused it to "cease to be a general partner" of, or dissociated from, the ECW partnership. Accordingly, it remains a general partner of the ECW partnership and retains standing to pursue a lawsuit for injuries it contends it sustained after its bankruptcy petition was filed in May 2023. Thus, the Court will deny the defendants' motion to dismiss the plaintiff's Complaint based on lack of subject-matter jurisdiction.

### B. The Defendants' Rule 12(b)(6) Challenges

Having considered and denied the Rule 12(b)(1) component of the defendants' motion to dismiss, the Court now turns to the defendants' Rule 12(b)(6) challenges in response to the plaintiff's claims alleging breach of contract, breach of the duty of good faith and fair dealing,

[5] Because the Court has determined that § 13.5.2 of the Partnership Agreement did not result in AmSurg withdrawing from or ceasing to be a general partner of ECW, the Court need not determine whether under § 13.3 of the Partnership Agreement there is a difference between "an order for relief" under Chapter 11 of the Bankruptcy Code or a "voluntary petition" under Chapter 11. Defs.' Reply at 4–5.

breach of fiduciary duty, wrongful withdrawal, civil conspiracy, aiding and abetting breach of fiduciary duty, and tortious contract interference.

**1. Choice of Law**

A threshold issue regarding the defendants' Rule 12(b)(6) motions requires a determination of the governing law for each of the plaintiff's claims. The defendants argue that although "the choice-of-law provision in the Partnership Agreement is enforceable as to the agreement's signatories, which include AmSurg, MGG and Dr. Weinstein[,]" it should not apply to "AmSurg's claims involving District Endoscopy and Drs. Howard and Daher, who are not signatories to the Partnership Agreement" and instead the Court should apply District of Columbia law to those claims because "the District has the most significant relationship with those disputes." Defs.' Mem. at 8–9 (citing Washkoviak v. Student Loan Mktg. Ass'n, 900 A.2d 168, 180 (D.C. 2006)).

The plaintiff agrees with the defendants that the Court must apply Tennessee law to the plaintiff's claims brought against MGG and Drs. Howard and Weinstein. Pl.'s Opp'n at 14. However, the plaintiff argues that "[the d]efendants overlook a threshold step in the choice-of law analysis" that being that "'[u]nder District of Columbia law, the court must first determine if there is a conflict between the laws of the relevant jurisdiction[s].'" Id. at 14 (citing Young Women's Christian Ass'n of the Nat'l Capital Area, Inc. v. Allstate Ins. Co. of Canada, 275 F.3d 1145, 1150 (D.C. Cir. 2002)). The plaintiff then notes that the defendants "spend several pages arguing which jurisdiction has the most significant relationship to the claims asserted in the Complaint, [but they] do not identify any relevant conflict between Tennessee and District of Columbia laws on the issues raised . . . ." Id. at 14 (citing Defs.' Mem. at 8–12). Furthermore,

the plaintiff states that "[the d]efendants cite Tennessee and District of Columbia law interchangeably throughout their substantive arguments. Id. at 14 (citing Defs.' Mem.).

"A federal court sitting in diversity must apply the choice-of-law rules of the forum state[,]" and therefore the Court must apply the District of Columbia's choice-of-law rules. In re APA Assessment Fee Litig., 766 F.3d 39, 51 (D.C. Cir. 2014). The Partnership Agreement provides that "[t]he laws of the State of Tennessee shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties hereto." Partnership Agreement § 20.5. Under D.C.'s choice-of-law rules, courts enforce this type of express contractual choice of law provision "'as long as there is some reasonable relationship with the state specified.'" Ekstrom v. Value Health, Inc., 68 F.3d 1391, 1394 (D.C. Cir. 1995) (quoting Norris v. Norris, 419 A.2d 982, 984 (D.C. 1980)).

This requirement has been satisfied, as the plaintiff is incorporated in the state of Tennessee. See Whiting v. AARP, 637 F.3d 355, 361 (D.C. Cir. 2011) (concluding that a "reasonable relationship" with the District of Columbia existed because one contractual party (the insurer) was "based in the District of Columbia" even though the other party (the insured) was a resident of Arizona). Accordingly, the Court will apply Tennessee law to the claims that are based on the contract and brought against contractual parties. These claims are Counts I through V brought against MGG, Drs. Howard and Weinstein.

For the remaining claims (Counts VI through VIII), the Court will apply the District of Columbia's "modified governmental interests analysis" approach to choice of law. APA Assessment Fee Litig., 766 F.3d at 51 (quoting Washkoviak, 900 A.2d at 180). Under this approach, the Court will "first determine if there is a conflict between the laws of the relevant jurisdictions." Young Women's Christian Ass'n of the Nat'l Cap. Area, Inc., 275 F.3d at 1150.

If a conflict exists, the Court will "determine, pursuant to District of Columbia choice of law rules, which jurisdiction has the 'more substantial interest' in the resolution of the issues." Id.

**2. Count I[6]**

**a. The Claims Against MGG and Dr. Weinstein**

The parties agree that the "Partnership Agreement is enforceable against . . . MGG [Group] and Dr. Weinstein[,]" as parties to the contract, and therefore, the plaintiff's breach of contract claim against these parties must be resolved under Tennessee law. Defs.' Mem. at 8; see Pl.'s Opp'n at 14. These defendants argue in their motion to dismiss that the plaintiff's claim fails because the Partnership Agreement ceased to bind the defendants prior to the alleged breach. This is allegedly because "each party's veto power over lease decisions gave [MGG] a mutually agreed 'escape hatch' from the partnership." Defs.' Mem. at 30. The defendants contend they leveraged this escape hatch by allowing the lease to expire, which resulted in the automatic termination of the Partnership and consequently the Partnership Agreement. See, e.g., Compl., Ex. B at 1, ECF No. 1-2 ("Without a functional ASC, the Partnership's business will cease, thus having the effect of ending the Partnership.").

To succeed in a breach of contract claim under Tennessee law, "claimants must prove [1] the existence of a valid and enforceable contract, [2] a deficiency in the performance amounting to a breach, and [3] damages caused by the breach." Fed. Ins. Co. v. Winters, 354 S.W.3d 287, 291 (Tenn. 2011). When considering a Rule 12(b)(6) motion in a breach of contract claim context brought under similar substantive state law, such a claim should survive so long as the

[6] While the Complaint did not specify which defendants Count I was brought against, the plaintiff's opposition clarifies that it "does not intend to pursue its claim under Count I against District Endoscopy or Dr. Daher" and brings Count I only against "MGG Group, Dr. Weinstein, and Dr. Howard." Pl.'s Opp'n at 24. To the extent the Complaint appears to bring Count I against Dr. Daher or District Endoscopy, those claims are dismissed based on the plaintiff's concession. Moreover, neither Dr. Daher nor District Endoscopy are parties to the Partnership Agreement, nor does the plaintiff allege that they are bound by it.

plaintiff has described the terms of the alleged contract and the nature of the defendant's breach.[7] Nattah v. Bush, 605 F.3d 1052, 1058 (D.C. Cir. 2010). Breach of contract claims "that meet these requirements will survive a motion to dismiss even if they are 'imprecise or vague.'" Hilltop Consultants, Inc. v. Cervino, No. 21-cv-2488 (RCL), 2022 WL 306361, at *2 (D.D.C. Feb. 2, 2022) (quoting Burnett v. Am. Fed'n of Gov't Emps., 102 F. Supp. 3d 183, 193 (D.D.C. 2015)).

The Court agrees with the plaintiff that it has met this burden as it submitted the Partnership Agreement with its Complaint, which contains the signatures of Dr. Weinstein, both on behalf of himself and on behalf of MGG, and terms therein stating that the contract "is [ ] valid and enforceable" against these parties. Compl. ¶ 76; see also CopyWatch, Inc. v. Am. Nat'l Red Cross, 299 F. Supp. 3d 189, 196 (D.D.C. 2018) (finding that the Court could properly consider the text of a contract submitted with a complaint in the absence of any challenge by any party at the motion to dismiss stage). The plaintiff identifies § 9.3 of the Partnership Agreement as the term that it believes was violated in Count I, which states in relevant part that MGG and Dr. Weinstein would not "have any direct or indirect ownership interest in, or manage, lease, develop or otherwise have a financial interest in, or receive compensation from any business or entity competing with [ECW] within the District of Columbia, or Chevy Chase or Bethesda, Maryland" for a period of at least one year. Compl. ¶¶ 77–78 (citing Partnership Agreement § 9.3).

---

[7] Although this statement was describing the dismissal standard for a breach of contract claim under District of Columbia law, its logic extends to breach of contract claims under Tennessee law, as the elements of such claims are essentially the same in both jurisdictions. See, e.g., Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009) ("To prevail on a claim of breach of contract [in the District of Columbia], a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.").

The Complaint has alleged with specificity facts tending to show that § 9.3 was breached, including assertions made by the defendants' counsel that its clients were "planning to establish a new center in the District of Columbia[,]" Compl., Ex. D at 2, ECF No. 1-4, and has further alleged specific preparatory steps taken by affiliates of MGG and Dr. Weinstein to violate § 9.3, including the publication of notices in The Washington Post and the filing of a letter of intent with the District of Columbia State Health Planning and Development Agency to establish a new surgery center. Compl. ¶¶ 69–74. These are actions that appear to be in direct violation of § 9.3's requirement that MGG and Dr. Weinstein not have any involvement with "any business or entity competing with [ECW] within the District of Columbia, or Chevy Chase or Bethesda, Maryland." Partnership Agreement § 9.3

When faced with an unambiguous contract, its interpretation is a question of law that the Court may consider at the motion to dismiss stage. See, e.g., 731 Real Est. Grp., LLC v. Fuzzell, No. W2024-01053-COA-R3-CV, 2025 WL 2977085, at *7 (Tenn. Ct. App. Oct. 22, 2025); Weng, 30 F.4th at 1136. The Partnership Agreement is unambiguous in stating that the partnership did not end due to the expiration of the lease. The Partnership Agreement clearly envisions that the Partnership "shall exist until December 31, 2043, unless terminated sooner pursuant to Article 14 of this Agreement." Partnership Agreement § 5 (emphasis added). And, Article 14 outlines the two events that would result in the early "[d]issolution of the Partnership": (1) "events of dissolution provided by law[,]" and (2) "withdrawal of the General Partner[,]" except in other limited circumstances not relevant here. Partnership Agreement § 14.

As indicated above, the plaintiff as the general partner has not withdrawn from the Partnership. And the defendants have failed to identify the applicability of any "event of dissolution provided by law." Id. Instead, the defendants' challenge to Count I focuses on

whether their decision to veto the new lease constituted a breach of the Partnership Agreement. This argument is irrelevant to the claim presented by the plaintiff in Count I, which is that the defendants breached the Partnership Agreement by opening a competing center, not that the defendants breached the Agreement by vetoing a new lease. See Compl. ¶¶ 77–80.[8] Further, these arguments advanced by the defendants concern a disputed question of fact not suited for resolution when addressing a motion to dismiss. See Pack v. Freed-Hardeman Univ., No. W202100311COAR3CV, 2023 WL 2207390, at *3 (Tenn. Ct. App. Feb. 24, 2023) ("The determination of whether a breach has occurred is a question of fact.") (citation modified). At bottom, the defendants have failed to articulate why refusing to approve a new lease would allow for defendants MGG and Dr. Weinstein to withdraw from and terminate the Partnership.

Therefore, the Court concludes that the Partnership was not dissolved based on the defendants' "escape hatch" theory, and therefore the plaintiff has successfully stated a claim against MGG and Dr. Weinstein for breach of contract due to a violation of § 9.3. Accordingly, the Court will deny the defendants' motion to dismiss Count I of the plaintiff's Complaint against defendants MGG and Dr. Weinstein.

**b. The Claims Against Dr. Howard**

The plaintiff also brings Count I against Dr. Howard, which for the most part is similar to what is indicated above against Dr. Weinstein and MGG, except that the plaintiff has alleged fewer facts to support its claim that "[t]he Partnership Agreement is a valid and enforceable

[8] The defendants further argue that even if they had breached the Partnership Agreement, the plaintiff's claim nonetheless fails since it "cannot allege damages because ECW's business would not continue after the expiration of the 2021 K Street Lease" as a result of MGG Group's refusal to approve a new lease. Defs.' Mem. at 31. But whether or not the plaintiff has suffered cognizable damages—including whether or not the ECW's business would continue after the K Street location's lease expiration—is a question of fact that the Court cannot consider at this stage of the litigation.

contract" against Dr. Howard, specifically.[9] Of greater concern, however, is the fact that Count I against Dr. Howard is parallel to Count II. See Compl. ¶ 87 ("If Dr. Howard agreed in writing to the provisions of § 9.3 . . .[,] then Dr. Howard has breached that agreement"). And while not argued by defendant Dr. Howard, the Court sua sponte notes that "[d]uplicative claims are those that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 81 (D.D.C. 2010)); see also Bailey v. Fed. Bureau of Prisons, 780 F. Supp. 3d 96, 123–24 (D.D.C. 2025). This is the case here because Counts I and II both allege that the "Partnership Agreement is a valid and enforceable contract[,]"[10] Compl. ¶¶ 76, 83, against Dr. Howard[11] and that Dr. Howard breached § 9.3's non-compete provisions. The Court will therefore grant the defendants' motion to dismiss Count I against Dr. Howard, as duplicative and "[a]s a matter of judicial economy." Wultz, 755 F. Supp. 2d at 81.

---

[9] Review of the Partnership Agreement attached to the plaintiff's complaint reveals signatures by MGG's representatives and Dr. Weinstein, but not Dr. Howard. See Partnership Agreement at 17, 22, 25. While "there is no requirement that a plaintiff attach a copy of the underlying contract to his complaint[,]" Badwal v. Bd. of Trs. of Univ. of D.C., 139 F. Supp. 3d 295, 319 (D.D.C. 2015), "a court may consider an exhibit referenced in the complaint without converting a 12(b)(6) motion to a motion for summary judgment[.]" Capitol Med. Ctr., LLC v. Amerigroup Maryland, Inc., 677 F. Supp. 2d 188, 191 (D.D.C. 2010). These signatures support the plaintiff's pleading requirements for Count I against MGG and Dr. Weinstein, but have no bearing on the pleading requirements as to Count I in regards to Dr. Howard.

[10] The plaintiff attempts to distinguish Counts I and II against Dr. Howard for the first time in its opposition brief, in contending that Count I against Dr. Howard is "based on her performance under and acceptance of the benefits of the Partnership Agreement[,]" rather than by express acceptance. Pl.'s Opp'n at 21 n.5. However, Counts I and II in the Complaint contain no such distinction. Count I is brought against MGG and Dr. Weinstein under an express acceptance theory, and there is no indication that Count I is brought against Dr. Howard under an alternative estoppel or quasi-contract theory. Neither is the assertion of an alternative contract theory implicit in either Count I or Count II. See Capitol Just., LLC v. Wachovia Corp., No. 07-cv-2095 (RCL), 2008 WL 11388566, at *8 (D.D.C. June 11, 2008) (dismissing a claim that, like estoppel, relied on the non-existence of an express contract because the "[p]laintiffs' complaint allege[d] that they and [the defendant] had a contract, but it fail[ed] to plead in the converse."). Because of this failure to plead any alternative contract theory in the Complaint, the Court declines to recognize the asserted alternative contract theory later advocated for in the plaintiff's opposition brief.

[11] The two Counts differ slightly (and without consequence to the Court's core duplicativeness analysis) in that Count II against Dr. Howard is pleaded in the alternative, while Count I is not. The Court dismisses Count I against Dr. Howard instead of dismissing Count II merely to preserve the integrity of Count II's alternate pleading structure.

### 3. Count II

The plaintiff brings claims under Count II against MGG and Dr. Howard based on alternative positions. The plaintiff alleges that either (1) MGG complied with the requirement in § 9.3 that "[p]rior to issuing stock to a new shareholder, [MGG] shall require such new shareholder to agree in writing to the provisions of this Section 9.3[,]" Partnership Agreement § 9.3 , or (2) that MGG did not comply with § 9.3. If the former is what occurred, then Dr. Howard is bound by § 9.3's non-compete restrictions and is allegedly liable for breach of contract. Compl. ¶ 87. If the latter is what occurred, then MGG is allegedly liable for breach of contract for failing to satisfy § 9.3's "Ownership Restrictions[,]" by not requiring Dr. Howard to agree in writing to the non-compete provision in § 9.3 of the Partnership Agreement. Compl. ¶ 88.

Both of the plaintiff's theories under Count II are sufficiently pleaded. As indicated above, for a plaintiff to survive a Rule 12(b)(6) motion challenging a breach of contract claim, the plaintiff must describe the terms of the alleged contract and the nature of the defendant's breach, Nattah, 605 F.3d at 1058, and breach of contract claims "that meet these requirements will survive a motion to dismiss even if they are 'imprecise or vague[,]'" Hilltop Consultants, 2022 WL 306361, at *2 (quoting Burnett, 102 F. Supp. 3d at 193).

The plaintiff has satisfied this burden by sufficiently "describ[ing] the terms of the alleged contract[,]" by submitting with its Complaint the Partnership Agreement, and identifying § 9.3 of the Partnership Agreement as the provision that it believes was violated. The plaintiff has also described "the nature of the defendant's breach" for each theory of liability by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). These

facts are the signatures representing MGG's consent to be bound by the Partnership Agreement, see Partnership Agreement at 17, 22, 25, and specific contractual provisions that state that MGG must have all new shareholders, including Dr. Howard, to "agree in writing to the provisions of § 9.3[,]" Partnership Agreement § 9.3.

Although the defendants oppose the plaintiff's decision to plead two mutually exclusive avenues for relief, as either MGG or Dr. Howard may be found liable for Count II but not both, such alternative pleading is expressly permitted by the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8(d)(2)–(3). And, the defendants have failed to demonstrate why such alternative pleading is improper in this case. The defendants take issue with the plaintiff's failure to determine at this stage whether "Dr. Howard agreed to § 9.3[,]" Defs.' Mem. at 25, yet the plaintiff is permitted such uncertainty when the plaintiff's "allegations are 'accompanied by a statement of the facts upon which the allegations are based[,]'" United States ex rel. Cimino v. Int'l Bus. Machines Corp., 3 F.4th 412, 424 (D.C. Cir. 2021) (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)). This position is further bolstered by the fact that whether Dr. Howard agreed to § 9.3 in writing is a fact known only to the defendants. While the defendants contend that the plaintiff, "[a]s general partner [ ] had the unqualified right to require MGG [Group] to provide proof" that Dr. Howard had agreed to § 9.3, Defs.' Mem. at 15, they also contend that the partnership "c[a]me to an end" prior to the initiation of this suit, id. at 5. It is therefore plausible that the defendants would not honor the plaintiff's supposed "unqualified right" to this information, since they deny the preconditions for this right to exist in the first place.

The defendants' assertion that the plaintiff's behavior constitutes "a waiver as a matter of law" is also rejected. The Court would reject the defendants' argument even if it accepted their

proposition that an affirmative defense, such as waiver, can be decided at the motion to dismiss stage where "the facts that give rise to the defense are clear on the face of the complaint." Defs.' Reply at 10 (quoting United States ex rel. Purcell v. MWI Corp., 254 F. Supp. 2d 69, 73 (D.D.C. 2003)). Under Tennessee law, waiver "is proven by a clear, unequivocal and decisive act of [a] party, showing a purpose to forgo the right or benefit which is waived." E & A Ne. Ltd. P'ship v. Music City Rec. Distributors, Inc., No. M2005-01207-COA-R3CV, 2007 WL 858779, at *7 (Tenn. Ct. App. Mar. 21, 2007); see also Strickler v. Garrison, No. 03A01-9705-CH-00181, 1997 WL 772848, at *5 (Tenn. Ct. App. Dec. 11, 1997) ("Waiver is the voluntary relinquishment of a known right."); Rivers v. Brooks, No. E202300506COAR3CV, 2024 WL 492114, at *4 (Tenn. Ct. App. Feb. 8, 2024) ("[T]he definition of waiver as 'a voluntary relinquishment by a party of a known right' applies to a waiver of the right to enforce a provision in a contract[.]"). The Complaint makes no such facially obvious admission of voluntary relinquishment of a known right by the plaintiff. See Strickler v. Garrison, No. 03A01-9705-CH-00181, 1997 WL 772848, at *6 (Tenn. Ct. App. Dec. 11, 1997) (holding that the plaintiff did not waive right to enforce restrictive covenant by inaction occurring prior to "when the violation became apparent"); E & A Ne. Ltd. P'ship v. Music City Rec. Distributors, Inc., No. M2005-01207-COA-R3CV, 2007 WL 858779, at *7 (Tenn. Ct. App. Mar. 21, 2007) (holding that a landlord's mere silence in response to reduced rent check amounts did not waive right to later enforce original rental agreement). Thus, the Court will deny the defendants' motion with respect to Count II of the plaintiff's Complaint.

### 4. Count III

Count III of the plaintiff's Complaint alleges that MGG and Drs. Howard and Weinstein[12] breached the Partnership Agreement by violating the implied duty of good faith and fair dealing by (1) misrepresenting to the plaintiff that new lease negotiations were on behalf of the Partnership, (2) "unilaterally" abandoning the Partnership, and (3) "refusing to approve any location for the" Partnership's surgery center. Compl. ¶¶ 93–95.

However, the defendants argue that under Tennessee law, the "breach of the duty of good faith and fair dealing 'is not a cause of action in and of itself but is a part of a breach of contract cause of action.'" Defs.' Mem. at 17 (citing Z.J. v. Vanderbilt Univ., 355 F. Supp. 3d 646, 699 (M.D. Tenn. 2018)) (other citations omitted). The plaintiff responds by arguing that "Count III clearly pleads breach of the duty of good faith and fair dealing as part of a breach of contract . . . and courts have routinely rejected technical arguments like the one [the d]efendants make here." Pl.'s Opp'n at 24 (citing Fountain Leasing, LLC v. Kloeber, No. 3:12-cv-317, 2013 WL 4591622, at *4 (E.D. Tenn. Aug. 28, 2013)). However, in Kloeber, the court found that a breach of contract claim that is solely based on a duty of good faith and fair dealing "is insufficient ground[] to state a claim upon which relief may be granted . . . [and] serves as part of a breach of contract action rather than serving as a cause of action in of itself." Id. at *4 (citations omitted). Further, "[t]he duty [of good faith and fair dealing] cannot create a breach of contract where one otherwise does not exist pursuant to the terms of the written agreement[,]" Neuro-Spine Sol., P.C. v. Freund, No. 2:07-cv-82, 2010 WL11519983, at *12 (E.D. Tenn. Sept. 21, 2010), and as

[12] While Count III simply states that it is brought against the "[d]efendants[,]" the plaintiff's opposition clarifies that it is brought only against the three aforementioned parties. See Pl.'s Opp'n at 23. Therefore, to the extent the Complaint appears to bring Count III against Dr. Daher or District Endoscopy, those claims are dismissed. Neither Dr. Daher nor District Endoscopy are parties to the Partnership Agreement, nor does the plaintiff allege that they are bound by it under any theory.

the plaintiff notes, Count III is based on "the implied duty of good faith and fair dealing[,]" Compl. ¶ 92. Accordingly, the defendants are correct that Count III must be dismissed against all of the defendants, although "Am[S]urg is free to make its good faith argument in the context of [Count I,]" its breach of contract claim that has been successfully pleaded. Defs.' Reply at 12.

**5. Count IV**

The plaintiff next brings claims against MGG for the alleged breach of fiduciary duties owed to the plaintiff, and against Drs. Howard and Weinstein for breach of fiduciary duties owed to both the plaintiff and to the ECW Partnership. See Compl. ¶¶ 99–103. The defendants assert that as a limited partner under the RULPA, MGG and Partnership Advisory Board members to the ECW Partnership—Drs. Howard and Weinstein—owe no fiduciary duties to the plaintiff, and that even if such duties were owed, their duties were fulfilled. See Defs.' Mem. at 33, 38–40.

The District of Columbia adheres to the "internal affairs doctrine," a choice-of-law principle by which the Court is directed to apply "the law of the state of incorporation with respect to claims involving an organization's corporate governance and internal affairs." Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of United States, 258 F. Supp. 3d 1, 8 (D.D.C. 2017). The internal affairs doctrine has been applied to a partnership organized as a limited liability company, and here the Court finds it appropriate to apply the doctrine to a limited partnership as well. See Wright v. Herman, 230 F.R.D. 1, 8 (D.D.C. 2005). The Court will therefore apply Tennessee law to the plaintiff's breach of fiduciary duty claims brought against all three defendants since the ECW was organized in Tennessee and Count VI addresses a question of "corporate governance and internal affairs." Boomer Dev., 258 F. Supp. 3d at 8.

The RULPA is silent on whether limited partners such as MGG owe statutory or common law duties of care and loyalty to their co-partners and to partnerships themselves. However, it

expressly subjects general partners of limited partnerships to such duties. See Tenn. Code Ann. § 61-2-403(a). Where, as here, the "legislature includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that the legislature acted purposefully in the subject included or excluded." State v. Loden, 920 S.W.2d 261, 265 (Tenn. Crim. App. 1995). By negative implication, merely being a limited partner would not impose any duties of care and loyalty. Indeed, the Tennessee Uniform Limited Partnership Act of 2017 ("2017 RULPA"), which governs all limited partnerships formed on or after January 1, 2018, Tenn. Code Ann. § 61-3-101 et seq., expressly indicates that "a limited partner does not have any duty to the limited partnership or to any other partner solely by reason of acting as a limited partner." Tenn. Code Ann. § 61-3-305(b). While the 2017 RULPA statute does not govern the ECW Partnership, which was formed in 1993, it clarifies the rule implied in the original RULPA statute that limited partners do not necessarily owe the duties of loyalty and care.

However, the plaintiff does not only allege that the duties were imposed as a function of being a limited partner. It also contends that fiduciary duties were imposed since MGG "played an active role in the management, operation, and control" of the ECW Partnership via its appointments to the Advisory Board and having volunteered to conduct lease negotiations and that these fiduciary duties extended to Drs. Howard[13] and Weinstein due to their membership on the Advisory Board. Pl.'s Opp'n at 28–29. The Supreme Court of Tennessee has "held that a fiduciary relationship 'arises when one person reposes special trust and confidence in another person and that other person—the fiduciary—undertakes to assume responsibility for the affairs

[13] Because the Court ultimately concludes that defendants MGG and Drs. Howard and Weinstein may have fiduciary duties based on the "special trust and confidence" which the plaintiff placed in these defendants, the question as to whether Dr. Howard signed the Partnership Agreement is irrelevant for the purposes of whether she owed fiduciary duties to the plaintiff.

of the other party." Redwing v. Cath. Bishop for Diocese of Memphis, 363 S.W.3d 436, 454 n.10 (Tenn. 2012) (quoting Overstreet v. TRW Commercial Steering Div., 256 S.W.3d 626, 641–42 (Tenn. 2008)). This conclusion is bolstered by the Editor's Note to the 2017 RULPA, which again does not govern the Partnership Agreement but may provide helpful guidance, which states that if the Partnership Agreement "creates a role for a limited partner[, this] . . . as a matter of other law, gives rise to a fiduciary duty." Tenn. Code Ann. § 61-3-305 (Editor's Notes). Thus, while the RULPA may not impose the duties of care and loyalty upon limited partners, Tennessee law would still subject limited partners to these duties when they "assume responsibility for the affairs" of another party.

The defendants nonetheless argue that they did not have these duties because they do not exercise absolute "dominion and control" over the plaintiff. Defs.' Mem. at 29–30. But, that is not the standard for the imposition of fiduciary duties on a party under Tennessee law, instead it must be demonstrated that "the fiduciary undertakes to assume responsibility for the affair of the other party." Overstreet, 256 S.W. at 642 (citation modified). Here, although the Partnership Agreement does state that "the management and control of the Partnership and its business and affairs shall rest exclusively with the General Partner[,]" the Partnership Agreement also makes clear that major decisions concerning the partnership, such as whether the Partnership should be dissolved and the admission of any new partner into the Partnership must be approved by the Advisory Board. Partnership Agreement §§ 10.2, 11.1. These responsibilities arguably demonstrate that AmSurg put "special trust and confidence" in defendants MGG and Drs. Howard and Weinstein regarding major partnership decisions, by authorizing MGG to nominate two of its members to serve on the Advisory Board and by having Drs. Howard and Weinstein as Advisory Board members. To hold as a matter of law that these defendants do not owe any

fiduciary duties to AmSurg as partners in a joint venture would conflict with the very essence of the partnership structure. Moreover, the extent to which the Advisory Board controlled the decisions of the Partnership and thus the amount of "special trust and confidence" AmSurg placed in the defendants is a question of fact that is not appropriate for the Court to decide at the motion to dismiss stage.[14]

The plaintiff alleges that defendants MGG and Drs. Howard and Weinstein violated their fiduciary duties of care and loyalty through "[t]he . . . development of this new Washington, D.C. surgery center without the consent of ECW and AmSurg, as well as their self-interested efforts to sabotage and force the cessation of ECW's successful existing business in favor of that new surgery center." Compl. ¶ 65. Defendants MGG and Drs. Howard and Weinstein in response argue that they were acting "in a commercially reasonable manner[,]" Defs.' Mem. at 25 (citing Barnes & Robinson Co., Inc. v. OneSource Facility Servs., 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006), and that "[i]n cases such as this where a contract does not provide an express standard for withholding consent to a proposed transaction, courts applying Tennessee law have imposed an implied obligation to act 'in a commercially reasonable manner[,]'" id. (citing OneSource Facility Servs., 195 S.W.3d at 669). And, the question as to whether defendants MGG and Drs. Howard and Weinstein were acting in a "commercially reasonable manner[,]" Defs.' Mem. at 25, or instead engaged in "intentional misconduct" in violation of their fiduciary duties is a question for the eventual factfinder to determine, see Pl.'s Opp'n at 30 ("Whether a fiduciary duty has been breached is a question of fact.") (citing B & L Corp. v. Thomas & Thorngren, Inc., 162 S.W.3d 189, 205 (Tenn. Ct. App. 2004). Thus, the Court

[14] The Court also notes that counsel for the defendants may have conceded that defendants Drs. Howard and Weinstein did in fact have "fiduciary duties." Pl.'s Opp'n at 29–30 (citing Compl. ¶ 57; Compl., Ex. F at 3, ECF No. 1-6).

concludes that the plaintiff has sufficiently pleaded its claim that defendants MGG and Drs. Howard and Weinstein breached their fiduciary duties owed to the plaintiff.

**6. Count V**

Turning next to the plaintiff's claim of wrongful withdrawal against MGG and Drs. Howard and Weinstein, the defendants allege that the claim fails as a matter of law because it is supported by "pure legal conclusions" and the defendants did not withdraw from the partnership but instead "exercised an unequivocal contractual right to withhold approval for ECW to enter into a new or extended lease." Defs.' Mem. at 28. In response, the plaintiff notes that the "[C]omplaint alleges that AmSurg, MGG, and Drs. Weinstein and Howard expressly agreed that the Partnership Agreement would last for a definite term of 50 years" and that the defendants "informed Am[S]urg that 'MGG will proceed as if the ASC will terminate operations when the existing lease expires.'" Pl.'s Opp'n at 33 (quoting Compl. ¶¶ 51, 53). And, according to the plaintiff, "[the d]efendants fail to address the [c]omplaint's allegations . . . [but instead] argue that they did not breach the Partnership Agreement by refusing to approve a new lease." Id. (citing Defs.' Mem. at 28) (emphasis omitted from the first quotation).

However, as the Court noted in its discussion of Count IV of the Complaint, when the legislature decides to include "particular language" in one part of the statute but not the other, the Court must assume that the legislature did so for a particular reason. Loden, 920 S.W.2d at 265. Here, the RULPA does not discuss liability for a limited partner's wrongful withdrawal from a partnership, and the statutes cited by the plaintiff are found in the RUPA. See Compl. ¶ 109 (citing Tenn. Code Ann. § 61-1-601(1); § 61-1-602(a)). In its Complaint, the plaintiff additionally cites to § 61-2-603, however, that provision of the RULPA simply states that "[a] limited partner may withdraw from a limited partnership at the time or upon the happening of

events specified in the partnership agreement and in accordance with the partnership agreement." In comparison, the provision of the RULPA discussing the withdrawal of a general partner makes clear the liability that a general partner faces for wrongfully withdrawing from the partnership, providing that "[a] general partner may withdraw from a limited partnership . . .[, but] if the withdrawal violates the partnership agreement, the limited partnership may recover from the withdrawing general partner damages for breach of the partnership agreement . . .[,] in addition to any remedies otherwise available under applicable law." Tenn. Code Ann. § 61-2-602.

Considering the relevant provisions of the 2017 RULPA, which the Court again notes do not govern the Partnership Agreement but can provide helpful context, they also support the Court's conclusion. This is because although the 2017 RULPA does state that "a person does not have the right to dissociate as a limited partner before the completion of the winding up of the limited partnership[,]" Tenn. Code Ann. § 61-3-601(a), the statute only discusses liability for a wrongful dissociation in the context of a general partner, Tenn. Code Ann. § 61-3-604(c) ("A person that wrongfully dissociates as a general partner is liable to the limited partnership . . . for damages caused by the dissociation.") (emphasis added). Thus, the Court finds that it would be inappropriate to fill the gap created by the RULPA's silence regarding the liability of limited partners for wrongful withdrawal and apply the provision of the RUPA's provisions, as the RULPA's silence on the liability of limited partners for wrongful withdrawal presumably was a purposeful legislative decision that the Court is bound to respect. Thus, the Court dismisses Count V of the Complaint.

**7. Count VI**

Next, the plaintiff brings a claim of civil conspiracy against all of the defendants alleging that the defendants have agreed to a common design to establish a new surgery center in competition with the ECW and "have sought to accomplish this common design by improper and unlawful means, including, without limitation: the breach of fiduciary duty by MGG, Dr. Weinstein, and Dr. Howard; Defendants' tortious interference with the Partnership Agreement, and MGG's wrongful withdrawal from the ECW partnership." Compl. ¶¶ 112–13. The defendants first argues that this claim must be dismissed because the Complaint "fails to sufficiently allege any underlying tort." Defs.' Mem. at 35. However, as concluded in the Court's discussion of Count IV, the Court finds that the plaintiff has sufficiently pleaded an underlying tort of breach of fiduciary duties by defendants MGG and Drs. Howard and Weinstein. See supra Section III(b)(5).

The defendants argue that the "civil conspiracy claim still must be dismissed under the intra-corporate conspiracy doctrine [, which] . . . 'holds that . . . a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.'" Defs.' Mem. at 36 (citing McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000)). And, according to the defendants, here "all of the [d]efendants allegedly fall within the corporate umbrella of MGG [and] Drs. Weinstein and Howard are alleged to be shareholders and directors of MGG." Id. (citing Compl. ¶¶ 11–12). In response, the plaintiff contends that "MGG Group has admitted to conspiring with 'one or more of [] those affiliated with [MGG][,]'" Pl.'s Opp'n at 34 (citing Compl. ¶ 52; Compl., Ex. D at 1, ECF No. 1-4) (emphasis omitted) (first alteration in the original), and "the [d]efendants have

admitted that 'MGG and certain physicians who were not MGG shareholders made plans to open a new ASC using a newly formed limited liability company[,]'" id. (citing Compl. ¶ 63).

While the defendants in one part of their brief allege that Tennessee law governs this claim, Defs. Mot. at 35–36, in another part they argue that District of Columbia law should instead control, Defs.' Mem. at 11. Because this claim is not based on the Partnership Agreement, the Court will apply the District of Columbia's choice of law rules. And, under the District of Columbia choice of law rules, the Court must first determine whether there is a conflict between the laws of Tennessee and District of Columbia. Young Women's Christian Ass'n of the Nat'l Cap. Area, 275 F.3d at 1150. Under Tennessee law, a civil conspiracy claim must contain the following elements—"a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 703 (Tenn. 2002). District of Columbia law requires "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 738 (D.C. 2000) (citations omitted). It is unclear to the Court to what extent these requirements conflict, because under Tennessee law "[e]ach conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent[,]" Brown v. Birman Managed Care, Inc., 42 S.W.3d 62, 67 (Tenn. 2001) (citing Dale v. Thomas H. Temple Co., 186 Tenn. 69, 90, 208 S.W.2d 344, 353 (1948)), whereas in the District of Columbia, a civil conspiracy claim "involves an agreement to participate in a wrongful activity[,]" Halberstam, 705 F.2d at 478.

However, because both parties cite District of Columbia law in their discussion of Count VI, the Court finds it appropriate to apply District of Columbia law.[15] Defs.' Mem. at 35; Pl.'s Opp'n at 34.

Under District of Columbia law, the Court finds that Count VI against all of the defendants must be dismissed. As noted in the defendants' brief, the District of Columbia recognizes the doctrine of intracorporate conspiracy,[16] which concludes that "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." Ex. Sandwich Shoppe, 749 A. 2d at 739 (citing Lockheed Martin, 206 F. 3d at 1036).[17] Here, all of the defendants fall under the MGG corporate umbrella, Drs. Howard and Weinstein have "held an ownership interest in MGG Group[,]" Compl. ¶¶ 11–12, District Endoscopy is "a subsidiary of MGG Group[,]" id. at ¶ 13, and Dr. Daher is the officer and medical director of the subsidiary District Endoscopy, id. ¶ 14. The plaintiff seemingly has no response to the defendants' intracorporate conspiracy doctrine argument except to argue that "[w]hether those affiliated persons qualify as corporate agents sufficient to bring them within the intracorporate conspiracy doctrine is a question of fact" and that "[the d]efendants have admitted that MGG and certain physicians who were not MGG

---

[15] Further, the conspiracy alleged by the plaintiff occurred in the District of Columbia, the underlying tort that supports the allegation of civil conspiracy is alleged to have occurred in the District of Columbia, and two of the defendants who are alleged to have been a part of the civil conspiracy do not appear to have any ties to Tennessee, as District Endoscopy is a District of Columbia company and Dr. Daher is a Virginia resident who practices medicine in the District of Columbia. Compl. ¶¶ 13–14.

[16] Tennessee law also recognizes the intracorporate conspiracy doctrine. See Trau-Med of Am., 71 S.W. 3d at 703–704 (holding "there can be no actionable claim of conspiracy where the conspiratorial conduct alleged is essentially acting through its officers, directors, employees, and other agents, each acting within the scope of his or her employment.").

[17] The Court notes that the District of Columbia Circuit has expressed an expansive view as to the actions that fall within an employee's scope of employment to the extent that "courts in the District of Columbia categorize practically any conduct as falling within the scope of, or incidental to, that authorized by their employer so long as the action has some nexus to the action authorized." Rasul v. Rumfield, 441 F. Supp. 2d 26, 34 (D.C. Cir. 2006) vacated on other grounds by Rasul v. Meyers, 555 U.S. 1083 (2008)).

shareholders made plans to open a new ASC using a newly formed limited liability company." Pl's Opp'n at 34. As to the first argument, AmSurg has already conceded that the named defendants in this case fall under the corporate umbrella of MGG. See generally Compl. As to the second argument, the Court finds that the plaintiff has failed to plead any facts from which the Court could infer who these non-MGG shareholders are and the extent to which they are involved in the new ASC. Thus, the Court must dismiss Count VI against all of the named defendants.

**8. Count VII**

The plaintiff also brings a claim of aiding and abetting a breach of a fiduciary duty, alleging that the "[d]efendants knew that MGG Group, Dr. Weinstein, and Dr. Howard owed fiduciary duties to AmSurg and knew that [their] conduct . . . constituted a breach of those fiduciary duties . . . [and] gave substantial assistance or encouragement to MGG Group, Dr. Weinstein, and Dr. Howard in breaching their respective fiduciary duties." Compl. ¶¶ 117–18. As the plaintiff notes, the "[d]efendants' only argument for dismissal of Count VII is that AmSurg has not sufficiently alleged an underlying claim for breach of fiduciary duty." Pl.'s Opp'n at 35 (citing Defs.' Mem. at 30).

For a complaint to survive a Rule 12(b)(6) motion to dismiss a claim for aiding and abetting a breach of fiduciary duty, under District of Columbia law, it must allege "(1) a fiduciary duty on the part of the primary wrongdoer, (2) a breach of this fiduciary duty, (3) knowledge of this breach by the alleged aider and abettor, and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." National R.R. Passenger Corp. v. Veolia Transp. Services, Inc., 592 F. Supp 2d 86, 94 (D.D.C. 2009) (Walton, J.) (quoting Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983)). "'Tennessee has adopted the

Restatement of Torts § 876 (b) theory of aiding and abetting, under which the plaintiff must show that 'the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts.'" Laws. Title Ins. Corp. v. United Am. Bank of Memphis, 21 F. Supp. 2d 785, 795 (W.D. Tenn. 1998) (citing Cecil v. Hardin, 575 S.W.2d 268, 272 (Tenn.1978)). The Court finds that there is no conflict between the elements for an aiding and abetting claim under the District of Columbia and Tennessee law.

Based on the plaintiff's Complaint, the Court holds that it has sufficiently pleaded a claim of aiding and abetting the breach of fiduciary duty against the defendants.[18] The Court concludes that it is plausible that the defendants could have knowingly provided encouragement or substantial assistance to MGG and Drs. Howard and Weinstein to breach the fiduciary duties they owed to the plaintiff, especially considering the allegations that District Endoscopy's "executing officer is Dr. Daher, who is affiliated with Capital Digestive Care [, the physician practice group] in which Dr. Weinstein serves as CEO and Dr. Howard serves as executive board member [and] District Endoscopy is a subsidiary of MGG Group and is owned by a subset of Capital Digestive Care physicians." Compl. ¶ 50.

**9. Count VIII**

Finally, turning to the plaintiff's claim that the defendants tortiously interfered with and/or induced a breach of EGW's Partnership Agreement §§ 5 & 9.3, the plaintiff alleges that the "[d]efendants knew of the [existence of the] Partnership Agreement [and] . . . with malice, intentionally induced a breach of the other [the d]efendants' respective obligations under the Partnership Agreement, without justification." Compl. ¶¶ 124–25. In response, the defendants

[18] However, as discussed further in the following section, Count VII is dismissed against defendant District Endoscopy, because the creation of that defendant is the alleged breach of fiduciary duty and thus it is not possible for it to have aided and abetted in the breach of fiduciary duty that led to its creation. Infra Section III(B)(9).

argue that "[t]ortious interference is not a viable cause of action here because each of the [d]efendants is either itself a party to the ECW Partnership Agreement or an agent or affiliate of MGG, the allegedly breaching party." Defs. Mot. at 31. The plaintiff in response argues that "courts have consistently held that a party to a multilateral contract – like the Partnership Agreement – may be liable for tortiously interfering with other parties' performance of the contract[,]" citing Raskauskas v. Temple Realty Co., 589 A.2d 17, 26-27 (D.C. Ct. App. 1991) (other citations omitted), and "the Complaint contains sufficient factual allegations that Dr. Daher and District Endoscopy (after it was created) tortiously interfered with the ongoing obligation of MGG Group, Dr. Weinstein, and Dr. Howard to abide by Section 9.3[,]" Pl.'s Opp'n at 36.

First, the Court must determine whether there is a conflict between District of Columbia and Tennessee law to determine the proper law to apply in evaluating whether the plaintiff's claim survives the motion to dismiss. Under District of Columbia law, in order for a tortious interference claim to be properly pleaded, the Complaint must demonstrate "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." Onyeoziri v. Spivok, 44 A.3d 279, 286 (D.C. 2012) (citing NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc., 957 A.2d 890, 900 (D.C.2008)). Under Tennessee law tortious interference claims contain the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, [and] (5) damages resulting from the tortious interference.

Trau-Med of Am., Inc., 71 S.W.3d at 701 (citation modified) (emphasis omitted). Here, there is conflict between the two requirements, namely element four under the Tennessee law which requires that a plaintiff demonstrate "the defendant's improper motive or improper means." See NCRIC, 957 A. 2d at 901 (holding that under District of Columbia law it is not an "an element of a prima facie case [for tortious interference] that the defendant's intentional interference be otherwise wrongful."). Applying the District of Columbia's modified interest analysis choice of law approach, the Court concludes that it must evaluate this claim under District of Columbia law because the alleged conduct that underlies the tortious interference claim occurred in the District of Columbia and the medical practices at issue are located in the District as well.[19]

Applying District of Columbia law, the Court concludes for the following reasons that Count VIII against all of the defendants must be dismissed, except as to Dr. Daher. First, the Court agrees with the defendants that there is a general rule that "individual defendants [who] . . . [are] acting as agents of the other party to [a] contract . . . c[an] not tortiously interfere with its own contract." Press v. Howard University, 540 A. 2d 733, 736 (D.C. 1988) (collecting cases). The case cited by the plaintiff in support of its position, Raskauskas, Pl.'s Opp'n at 35–36, is inapposite here because there is no third party to the Partnership Agreement, the key differentiating fact that led the District of Columbia Court of Appeals in Raskauskas to depart from "the common sense notation that a plaintiff should not be allowed to convert a breach of contract claim into a claim for tortious interference[,]" 589 A. 2d at 27. Therefore, the Court concludes that MGG and Drs. Howard and Weinstein cannot be liable to the plaintiff for the

---

[19] Furthermore, the parties seemingly agree as both the plaintiff and the defendants cite to District of Columbia law in their analysis of Count VIII. See Defs. Mot. at 31; Pl.'s Opp'n at 35.

claim of tortious interference because they are either signatories to the Partnership Agreement, or in the case of Dr. Howard, acted as an agent of a signatory to the Agreement, in the event that it is ultimately concluded that she did not sign the Agreement.

The Court also concludes that Count VIII must be dismissed as to defendant District Endoscopy as well. As the defendants note, the very creation of District Endoscopy is the alleged breach of the Partnership Agreement and therefore it would be "impossible to hold District Endoscopy liable for tortiously inducing the alleged bad act that led to its existence." Defs.' Reply at 33. The plaintiff argues that District Endoscopy is currently "interfere[ing] with the ongoing obligation of MGG Group, Drs. Weinstein, and Dr. Howard to abide by Section 9.3 [of the Partnership Agreement]" by applying for a certificate of need and engaging the architecture and engineering firm that is constructing the competing ASC. Pl's Opp'n at 36 (emphasis in the original). However, none of these actions demonstrate tortious interference by District Endoscopy, see Compl. ¶¶ 116–28, instead the tortious interference alleged by the plaintiff is the fact that District Endoscopy was created by the former member of MGG and is allegedly in direct competition with EWG. Therefore, Claim VIII must also be dismissed with respect to District Endoscopy. Finally, as to Dr. Daher, the Court concludes that the plaintiff has stated a claim of tortious interference against him for the same reasons indicated above regarding the Court's discussion of Count VII concerning Dr. Daher. See supra Section III(B)(8).

## IV. CONCLUSION

For the foregoing reasons, the Court will deny in part and grant in part the defendants' motion to dismiss.

**SO ORDERED** this 19th day of November, 2026.[20]

REGGIE B. WALTON
United States District Judge

[20] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.